UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br><br>v.<br><br>GOLUSIN et al,<br>Defendant. | **MEMORANDUM AND ORDER**<br><br>25-CV-02379 (LDH) (TAM) |

LASHANN DEARCY HALL, United States District Judge:

The Securities and Exchange Commission (the "SEC," "the Commission," or "Plaintiff") brings this action against Defendants Albert Golusin, Peter Jacobs, and John Scuderi (collectively, "Defendants"), alleging Defendants: violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder (all Defendants), violated section 17(a) of the Securities Act (all Defendants), and violated Sections 5(a) and 5(c) of the Securities Act (Defendants Golusin and Jacobs). Defendant Golusin moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint in its entirety.

## BACKGROUND

### I. The Parties

The Defendants occupied different positions within American Green or its predecessors from January 1, 2017 through at least mid-2022 (the "Relevant Period"). (Compl. ¶ 1, ECF No. 1.) Defendant Golusin served as the CFO of SunnComm Technologies, Inc. and SunnComm International, Inc., predecessor entities of American Green, from approximately January 2003

until December 2005. (*Id.* ¶ 5.) During the Relevant Period, Golusin continued to serve as the de facto CFO of American Green and controlled American Green's finances. (*Id.* ¶ 5.) Likewise, Defendant Jacobs served as the President, CEO, and Director of American Green's predecessor entities: SunnComm, Inc., SunnComm Technologies, Inc., SunnComm International Inc., and The Amergence Group, Inc. from approximately 2000 until his resignation on February 14, 2011. (*Id.* ¶ 6.) During the Relevant Period, Jacobs continued to exercise undisclosed control of American Green. (*Id.*) Lastly, Defendant Scuderi served as the Vice President of Business Development at American Green from approximately November 2018 until at least June 2021. (*Id.* ¶ 7.) Scuderi assisted Jacobs and American Green with, among other things, investor relations and marketing of American Green stock from approximately November 2018 until 2022. (*Id.*)

## II. The Allegations

The SEC alleges that from January 1, 2017, to at least mid-2022, Defendants created a fraudulent scheme to sell American Green stock to investors in the public United States securities markets. (Compl. ¶ 1.) Specifically, the SEC alleges that, Defendants Jacobs and Golusin, individually or through nominee entities under their control, lent money to American Green in exchange for secured convertible debentures for which they received millions of American Green shares at a steep discount to the market price. (*Id.* ¶¶ 2, 52-55.) Jacobs and Golusin misrepresented their control of American Green to American Green's transfer agent, their broker-dealers, and the investing public to aid in the sales of their shares. (*Id.* ¶¶ 59-62.) In furtherance of this scheme, American Green's OTC Markets filings, which were frequently drafted and reviewed by Golusin and Jacobs, failed to disclose that Jacobs, Golusin, or any of their nominee entities were control persons of American Green. (*Id.* ¶¶ 44-45.) The SEC alleges

that these omissions allowed Defendants to remove any trading restrictions and distribute the stock to the public in unregistered, resale transactions. (*Id*. ¶¶ 2, 56-58.) This "pump and dump" operation Defendants orchestrated generated more than $21 million in net trading proceeds. (*Id*. ¶ 55.) As a result of this scheme, Defendant Golusin and his nominee entities alone are alleged to have made $10 million in trading profits and his sales of American Green's outstanding shares consistently exceeded Securities Act Rule 144's limitation that affiliates cannot sell more than 1% of a company's outstanding shares within a 90-day period. (*Id*. ¶¶ 55, 58, 83.)

While Defendants Golusin and Jacobs did not hold official titles at American Green during the Relevant Period, they exercised substantial control over American Green's finances, investor relations, corporate actions, share issuances, and hiring decisions—which they often exercised without the input of the CEO. (*Id*. ¶ 30.) Specifically, Defendants Golusin: "(i) was a signatory on the American Green bank account until October 2018; (ii) drafted a misleading response to a surveillance inquiry from FINRA on behalf of American Green; (iii) drafted and revised American Green's corporate disclosures posted on OTC Markets; (iv) facilitated the issuance of [Company] shares, including by instructing the transfer agent and submitting documentation falsely claiming that Jacobs, Golusin, and their associated entities were not affiliates of American Green; and (v) made decisions regarding American Green's business acquisitions." (*Id*. ¶ 32.) The Complaint also alleges that Defendants Golusin and Jacobs routinely made financial decisions and effectuated transactions on behalf of American Green, while misrepresenting their control of American Green to investors, the public, and the Financial Regulatory Authority[1] ("FINRA"). (*Id*. ¶¶ 37-42, 46-49). To assist their sale of American Green share, Defendant Golusin is alleged to have engaged in deceptive promotional practices—such as

[1] FINRA is a self-regulatory organization that monitors trading on stock markets and regulates brokerage firms.

orchestrating stock promotion campaigns that contained misleading or inaccurate disclosures that concealed who was behind the promotions —to generate interest in the Company's stock. (*Id.* ¶¶ 63, 85, 93-94.)

**STANDARD OR REVIEW**

Generally, to withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* With respect to claims alleging fraud, however, Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Any allegations that are "conclusory or unsupported by factual assertions" will be deemed insufficient. *Id.*

**DISCUSSION**

**I. The Complaint Establishes Defendant Golusin's Affiliate Status**

Section 5 of the Securities Act is designed to promote mandatory disclosures of all material information regarding a securities offering to ensure a transparent and secure market for investors As such, Section 5 of the Act requires securities to be registered with the Commission before "any person may sell or offer to sell such securities." *S.E.C. v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005) (citing 15 U.S.C. § 77e ("any person, directly or indirectly, to make use of any

means or instruments of transportation or communication in interstate commerce or of the mails to sell such security[ies].")) There are certain exemptions to this general rule. At issue here is the exemption created by Section 4(1) of the Act which exempts "transactions by any person *other than* an issuer, underwriter, or dealer" from the registration requirements imposed by Section 5. 15 U.S.C. § 77a(1) (emphasis added); *see also S.E.C. v. Cavanagh*, 445 F.3d 105, 111 (2d Cir. 2006). An issuer is defined broadly as '"every person [, corporation or partnership] who issues or proposes to issue any security."' *S.E.C. v. Manus*, No. 80 CIV. 724, 1981 WL 1683, at *5 (S.D.N.Y. Oct. 7, 1981) (quoting 15 U. S. C. § 77b(4)). The definition of issuer also includes "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." §77b(a)(11)); *see also Cavanagh*, 445 F.3d at 111. Consequently, an "affiliate" of an issuer, defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer," is subject to Section 5's registration requirements. 17 CFR § 230.144(a)(1).

In this case, Plaintiff maintains Defendant's liability is born out of his status as an affiliate. In its motion, Defendant argues that the Complaint fails to adequately allege that he was an affiliate of the issuer, American Green. (Mem. Law Supp. Def.'s Mot. to Dismiss ("Mot.") §§ III.A, III.E, ECF No. 37.) Specifically, Defendant contends that the Complaint does not plead sufficient facts to establish his requisite control over American Green's dealings so that he may be considered an "affiliate" of the company. (*Id.*) The Court disagrees.

The concept of control is "not a narrow one" and "is a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved." *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976). Majority stock ownership is only one indicium of control, and "control

may rest with more than one person at the same time or from time to time." *Id*. (citations omitted). Courts often find control where the individual was responsible for the company's financial relationship with the public and was able to exercise independent authority or influence the exercise of authority. *Id*. ("the evidence was overwhelming that [Defendant] was responsible for numerous and essential programs of [the company] including financing of [the company]. He controlled [the company's] financial relationship with the public and was able to exercise authority independent of [the COO] and at the same time influence the authority exercised by [the COO]"); *see also Kern*, 425 at 150. In line with this standard, the Complaint contains sufficient facts that speak to the influence and control Defendant exercised over American Green's financial relationships and public dealings. For example, the Complaint alleges that Defendant exercised independent authority over the Company's financial dealings by "draft[ing] and revis[ing] American Green's corporate disclosures posted on OTC Markets [,] facilitat[ing] the issuance of [Company] shares, including by instructing the transfer agent and submitting documentation falsely claiming that Jacobs, Golusin, and their associated entities were not affiliates of American Green[,] [and] made decisions regarding American Green's business acquisitions." (Compl. ¶ 32.) The Complaint also alleges that Defendant had a largely unmitigated role in initiating and instructing the transfer of Company shares to himself and his co-Defendants. (*Id*. ¶¶ 60-62.) These allegations alone are sufficient to show the control Defendant had over the Company's financial dealings and establish his affiliate status. *See Corr*, 543 F.2d at 1050 (finding affiliate status where defendant was found to have had control over the company's financial dealings); *Waldman ex rel. Elliott Waldman Pension Tr. v. Riedinger*, 423 F.3d 145, 151 (2d Cir. 2005) (explaining how the "key question" in a control analysis is whether the defendant had the ability to "direct the management and policies" of the entity); *S.E.C. v.*

*Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) ("[Defendant] contends principally that he was not an affiliate. . . because he was not an officer, director, or 10% shareholder. . . Assuming each of those assertions is so, his personal management of the entire DPO process and his control of the public float in [company] shares gave him an equivalent degree of control to qualify as an affiliate."). Therefore, Defendant's argument that the Complaint fails to adequately allege his affiliate status and thereby fails to state a claim for a violation of Section 5's registration requirement must be rejected.

**II. The Complaint Successfully Alleges Scheme Liability**

Section 10(b) of the Exchange Act, rules 10b-5(a) and (c) thereunder, and Sections 17(a)(1) and (3) of the Securities Act constitute what is commonly referred to as the "scheme liability" provisions. To state a claim for scheme liability under Section 10(b) of the Exchange Act, rules 10b-5(a) and (c) thereunder, and Section 17(a)(1) and (3) of the Securities Act, Plaintiff must show "that defendants: (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *Sec. & Exch. Comm'n v. Laura*, 680 F. Supp. 3d 204, 232 (E.D.N.Y. 2023) (internal quotes and citations omitted). To do so under Section 17(a)(3) of the Securities Act, Plaintiff must allege the same elements as above but is only required to make a showing of negligence, not scienter. *Id*. Allegation of misstatements and omissions are not enough to allege scheme liability. *Du v. Segelman*, No. 23-CV-6780, 2025 WL 1707176, at *11 n.11 (E.D.N.Y. Mar. 28, 2025) ("misstatements and omissions cannot form the sole basis for scheme liability" (internal citations and quotes omitted)). Instead, a plaintiff must "specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105

(2d Cir. 2021) (internal citation and quotation omitted). Plaintiff has successfully met these requirements.

Defendant argues that the Complaint does not successfully plead a claim for scheme liability because it only contains "alleged misstatements regarding Mr. Golusin's affiliate status," and insufficient allegations regarding Defendant's receipt of promoter invoices and information regarding promotional campaigns. (Mot. §III.B.) Not so. The Complaint clearly articulates the "contours of an alleged scheme to defraud investors" and does not rely solely on Defendant's misstatements to do so. *See Danske Bank A/S*, 11 F.4th at 105 (declining to find scheme liability where plaintiff failed to "articulate with precision the contours of an alleged scheme to defraud investors"). Specifically, the Complaint alleges facts that show how Defendant engineered and participated in a "pump-and-dump" scheme where he dodged trading restrictions by failing to disclose his affiliate status, engaged in promotional efforts that hid is affiliation with the company and its stock, and successfully offloaded the stock he owned on the unsuspecting investing public "while concealing. . . that the shares were being sold, in bulk, by people who controlled the company." (Compl. at ¶¶ 3, 60, 62-63, 67, 85, 94.); *see United States v. Salmonese*, 352 F.3d 608, 612 (2d Cir.2003) (defining pump and dump schemes)). Courts have routinely found this type of deceptive conduct violates securities laws and is enough to impose scheme liability. *See S.E.C. v. Page*, No. 21-CV-5292, 2024 WL 4468040, at *7 (E.D.N.Y. Sept. 13, 2024), report and recommendation adopted, No. 21-CV-5292, 2024 WL 4467371 (E.D.N.Y. Oct. 10, 2024) (finding that Defendants concealment of the their control and substantial interest in the company and creation of false and misleading opinion letters to enable stock certificates supported scheme liability.); *S.E.C. v. DeFrancesco*, 683 F. Supp. 3d 367, 375 (S.D.N.Y. 2023) (finding scheme liability where Defendant participated in and orchestrated a pump and dump

scheme.); *S.E.C. v. Airborne Wireless Network*, No. 21 CIV. 01772, 2023 WL 5938527, at *23 (S.D.N.Y. Sept. 12, 2023) ("Courts have determined that those playing a leading role in the larger scheme as a whole – and in particular a pump-and-dump scheme – are liable for that scheme"). Thus, Plaintiff has adequately alleged that Defendant knowingly engaged in deceptive acts in furtherance of a fraudulent scheme and has successfully alleged a claim for scheme liability.

## III. The Complaint Adequately Pleads Defendant Golusin Made False and Misleading Statements

While allegation of misstatements are not enough to plead a scheme liability claim, they are essential to successfully plead a claim under Section 10(b) of the Exchange Act, rule 10b-5(b) thereunder, and Sections 17(a)(2) of the Securities Act. To successfully plead a claim under these provisions, Plaintiff must show that "in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter." *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (citations omitted). Defendant argues that Plaintiff failed to meet this standard because Plaintiff does not allege any specific misstatements or omissions made by the Defendant, (Mot. § III.C.) The Court disagrees.

The Complaint alleges Defendant knowingly made false and misleading statements regarding his control over American Green and his involvement in stock promotion campaigns. For example, the Complaint alleges that Plaintiff "repeatedly submitted attorney opinion letters to American Green's transfer agent that contained false information[,] supplied by Golusin[], asserting that Jacobs, Golusin, and their nominee entities were not affiliates of American Green" to secure unrestricted shares of the company which he then deposited into brokerage accounts. (Compl. ¶¶ 61-62.) Defendant is then alleged to have lied about his status as an "affiliate/control

person of American Green" and to have submitted "144 Seller's Letters. . . falsely affirming that [Golusin and Jacobs] were not affiliates of the Company" in order to deposit the shares into brokerage accounts. (*Id.*) Furthermore, the Complaint alleges that Defendant orchestrated stock promotions containing "misleading or inaccurate disclosures". (*Id.* ¶ 85.) This is in addition to allegations that Defendant concealed "American Green's involvement in orchestrating stock promotion campaigns" in the company's OTC Markets filings, which he drafted and reviewed. (*Id.* ¶ 93.) These examples belie the contention that the Complaint does not include clear allegations regarding specific misstatements Defendant made.

Even if the complaint brings forth clear allegations of specific misstatements, Defendant argues that Plaintiff's claims must fail because (1) Defendant "had no obligation to disclose the information at issue"; and (2) because Defendant cannot be said to be the '"maker' of the misrepresentation or omission." (Mot. at 16 (quoting *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011)). These arguments are unavailing. *First*, as the Court explained in Section I, Defendant, as an affiliate, is bound by Section 5's disclosure requirement and had an affirmative duty to disclose his control over American Green's dealings. (*Supra* § I.); *see also* Cavanagh, 445 F.3d at 115 ("Registration exemptions are construed strictly to promote full disclosure of information for the protection of the investing public. It would defeat the purpose of the broad definition of an issuer—which includes affiliates. . . to permit affiliates, with full access to non-public information, to negotiate the terms of a sale but then escape liability."). *Second*, Defendant directs the Court to the decision in *Janus Cap. Grp., Inc* for the proposition that he cannot be said to be the "maker" of the alleged misstatements and omissions. Not so. In *Janus*, the Supreme Court held that an investment advisor is not liable under Rule 10b-5 for false or misleading statements found in the client's prospects because the advisor

cannot be said to have "made" the false or misleading statements. *Janus*, 564 U.S. 135 at 148. The Court arrived at this conclusion because it found that "[f]or purposes of Rule 10b–5, the maker of a the statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. The Court reasoned that "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." *Id*. Here, as explained in Section I, Plaintiff, as an affiliate of American Green, has the requisite control. Therefore, Plaintiff is a "maker" of the alleged false statements within the meaning of *Janus*.

## IV. The Complaint Adequately Pleads Defendant Golusin Acted with Scienter

Defendant's argument as to scienter does not fare any better. In addition to his arguments regarding the lack of allegations as to specific misstatements or omissions, Defendant argues that the facts alleged "do not give rise to a strong inference of fraudulent intent." (Mot. § III.D.) This is incorrect.

For the purposes of establishing liability under 10(b) and Rule 10b-5, scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 319 (2007). To successfully plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Shaar Fund, Ltd.*, 493 F.3d at 99 (citing 15 U.S.C. § 78u-4(b)(2)). A plaintiff can do so by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citation omitted). Here, Plaintiff pleads numerous facts that speak to the motive and opportunity Defendant had to commit fraud. For example, Plaintiff pleads facts that show Defendant's participation in, and orchestration of, a "pump and dump"

operation that generated over $21 million in net trading proceeds. (*Supra* § II.) Defendant argues that trading profits cannot serve as proof of scienter. (Mot. at 18.) However, the Second Circuit has made clear that "[s]ufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures" and that plaintiffs "must assert *a concrete and personal benefit* to the individual defendants resulting from the fraud" to sufficiently establish motive. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted) (emphasis added). This is exactly what Plaintiff has done here. Plaintiff makes it clear that the trading profits Defendant personally stood to derive were the motivation behind the "pump and dump" operation that artificially inflated stock value prior to a sale by Defendant. (Pl.'s Mem. Opp'n Mot. Dismiss, at 19-21); (*See* Compl. ¶¶ 68 ("The aim of these [] efforts was to generate buying interest in American Green stock so that Jacobs and Golusin could unload their shares at a high profit".)) As such, Plaintiff has alleged enough facts to show Defendant acted with scienter. [2]

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Complaint is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
September 30, 2026

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

[2] Defendant's final argument does not fall into any of the four categories the Court covered, and is the least convincing. In §III.F of his motion, Defendant argues that the complaint should be dismissed as a "shotgun pleading" because it "incorporate[s] every factual allegation into each claim for relief . . . requir[ing] the opposing party and the court to attempt to figure out which allegations support each claim for relief." (Mot. at 20.) This is a nonissue. Courts in this circuit routinely allow plaintiffs to incorporate factual allegations in their claims for relief. *Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*, No. 06 CIV. 8195, 2008 WL 2695090, at *3 (S.D.N.Y. July 8, 2008) ("[I]ncorporation of preceding paragraphs into subsequent causes of action is a standard practice").